SUPREME COURT. Dutchess General Term, August, 1855. *Brown, S. B Strong* and *Rockwell, Justices.*

THE PEOPLE *vs.* THOMAS TOYNBEE.

THE PEOPLE *vs.* PHILLIP BERBERRICH.

The act entitled " an act for the prevention of intemperance, pauperism and crime," passed April 9, 1855, so far as it prohibits the sale of intoxicating liquors to be drank as a beverage, is in conflict with that portion of art. 1, sec. 6 of the state constitution, which declares that no person shall be deprived of property without due process of law, and is therefore void. Justice ROCKWELL dissenting.

The provision of the 5th section of the act, which requires a person accused to be tried before a court of Special Sessions, and deprives him of the privilege of giving bail to appear before the next criminal court, is unconstitutional and void, inasmuch as it takes away the right of " trial by jury " secured by the constitution of this state.

So much of the first section of the act, as declares that intoxicating liquor shall not be sold or kept for sale, or with intent to be sold, except by the persons and for the special uses mentioned in the act ;—

So much of sections 6, 7, 10 and 12, as provides for its seizure, forfeiture and destruction ;—

So much of 16th section, as declares that no person shall maintain an action to recover the value of any liquor sold or kept by him, which shall be purchased, taken, detained or injured, unless he can prove that the same was sold according to the provisions of the act, or was lawfully kept and owned by him ;—

So much of section 17, as declares that upon the trial of any complaint under the act, proof of delivery shall be proof of sale, and proof of sale shall be sufficient to sustain an averment of unlawful sale ;—

And so much of section 25, as declares that intoxicating liquor kept in violation of any of the provisions of this act shall be deemed a public nuisance, are repugnant to the provisions of the constitution for the protection of liberty and property and absolutely void. Per BROWN, J.

The facts in these cases are sufficiently set forth in the opinion of Mr. Justice Brown. The secondly above entitled cause was argued by

*J. Thompson* and
*T. C. Campbell* (District Attorney) for the people.
VOL. II.                42

*J. F. Barnard* and
*H. A. Nelson* for the prisoner.

The first above entitled cause was argued by

*John M. Van Cott* and
*N. F. Waring* for the people.

*John A. Lott* and
*A. Hadden* for the defendant.

BROWN, J.—Phillip Berberrich, the defendant in one of these actions, was arrested under the act of the 9th of April, 1855, entitled "An Act for the Prevention of Intemperance, Pauperism and Crime," charged with having in his possession, with intent to sell and with having sold, intoxicating liquor called lager bier. He was brought before E. Q. Eldridge, Esq., county judge of Dutchess county, and upon a trial by a jury, was found guilty. At this stage, and before sentence, the proceedings were removed into this court by *certiorari*.

Thomas Toynbee, the defendant in the other action, was also arrested under the same act, without warrant, by John Mathews, a police officer, and brought before D. K. Smith, a police justice of the city of Brooklyn, and there charged with being in the act of selling intoxicating liquor, to wit: one glass of brandy — and also with having in his possession other intoxicating liquor, to wit: champagne wine, with intent to sell the same. The wine was seized by the officer. At the trial before the justice without a jury, sitting as a court of Special Sessions, Toynbee was found guilty, and sentenced to pay a fine of $50, with $5·87 costs, and to be committed until such fine and costs be paid, for a period not exceeding fifty-six days. It was also adjudged that the liquor seized be forfeited, and a warrant issued for its destruction. The defendant appealed to the general term of this court, and thus we have the principal questions which arise upon the construction of the

The People *v.* Toynbee.

act — its force and obligation as a law, presented for the consideration and judgment of this court.

The object to be effected by the statute under which these proceedings are had, must be ascertained from an examination of its various sections, twenty-six in number. If its office is one of mere regulation — to prescribe by whom and to whom, and at what places, liquors in certain quantities may be sold — then it does no more than the excise law which it is thought to supersede; and although prejudicial to existing interests, and may subject certain classes to some privations and inconveniences, it is nevertheless a law of binding obligation, which the people must obey and the tribunals of justice enforce. If, however, its office and purpose is greater and more comprehensive than mere regulation; if it aims at prohibition, prohibition of sales as well as of general and ordinary uses, to an extent which deprives the subject of the law of its value, and strikes down the vast and varied interests concerned in its importation, sale and production; if it provides for the seizure, forfeiture and destruction of an article or thing, the product of human industry hitherto invested with the attributes of property, solely because its producers or owners design to make it the subject of sale and transfer, to deal in it and with it as property, and apply it to general uses, then the question assumes a very different character, and we are brought to inquire whether an act pregnant with such consequences, and armed with such unusual and dangerous powers, is really within the sphere of legislative authority. It is just to observe, that while sales by persons generally and for general uses are expressly forbidden, there is no positive interdict against its general use when lawfully acquired. Yet, as there can be no lawful sales after the act takes effect, except by the authorized venders for certain special purposes, and as the act is careful to impose one of its penalties upon purchasers from authorized venders, under a false representation that it is designed for an authorized use, it seems clear that the intent was to interdict the general use.

Section one forbids the sale, and the keeping for sale, or with

the intent to sell, except in the cases enumerated in the subsequent sections, and also in the case mentioned in the last clause of the same section, which clause is supposed to be of doubtful import. The sales excepted from the prohibition of the first section, other than those in the latter clause, are sales to authorized venders, and sales by them for mechanical, chemical and medicinal purposes, and of wine for sacramental uses: also, sales of cider in quantities not less than ten gallons, sales of alcohol by manufacturers, of wine from grapes grown by the seller, and of foreign liquor in the original packages to authorized venders. Section four declares offences against the act misdemeanors and provides for their punishment by fines and imprisonment. Section five designates the officers who shall have cognizance of such offences, and prescribes the form of the proceedings and of the trial. Sections six and seven contain what are called the search and seizure clause; and section ten provides for the condemntaion and destruction of the liquor. Section twelve authorizes sheriffs, marshals, constables and policemen to serve the process, arrest persons in the act of selling, and to seize without warrant liquor kept against the provisions of the act. The owner may interpose a claim to the liquor seized pursuant to the provisions of section seven, but he must first purge himself under oath of any design to disobey or evade the law, before he can be noticed or heard. Section sixteen deprives the owner of his right of action to recover the value of any liquor sold to a purchaser, or taken, detained or destroyed by a wrong-doer, unless he shall prove that such liquor was sold according to the provisions of the act, or was lawfully kept and owned by him. And section seventeen declares, that upon the trial of any action to enforce the penalties and forfeitures, proof of a delivery shall be deemed evidence of sale, and proof of sale shall be sufficient to sustain the averment of unlawful sale. Section twenty-five declares all liquors kept in violation of any of the provisions of the act a public nuisance. The abatement of public nuisances is one of the remedies by the act of the party which the law concedes to any person injured, and he may proceed

The People *v.* Toynbee.

to the removal and destruction of the nuisance without the process or judgment of any court. (3 *Black. Com.*, 5.) So that if this clause is to have any effect, it can be none other than to invite and justify depredations upon the proscribed article. These provisions are vindictive. They are novel and unusual. If we except some few states of the confederacy, who have recently entered upon a similar course of legislation, they have never before found a place in the written code of a civilized country. They are designed to work a forfeiture of goods, a deprivation of liberty and property by means unknown to the common law. They set aside the just and humane rules of evidence, approved by time and sanctioned by sound philosophy. They assume a delivery to be a sale, and proof of a sale sufficient to sustain an averment of unlawful sale. And they refuse to notice or hear a citizen in defence of his own property, unless he first submit to take the oath demanded by the act, and disclose the facts upon which he relies to establish his innocence. It awakens strange emotions in this age of progress and improvement, to behold enactments like these embodied amongst the written laws of a people distinguished for their moderation, their moral excellence, their love of justice, and their ready perception of the distinction between right and wrong, a people of Anglo-Saxon lineage, versed in the jurisprudence of Coke and Blackstone, and Kent and Story, and who are proud to trace the fundamental principles of their government upward, through the revolutionary struggles of 1776 and 1688, the conflicts and trials of the Great Rebellion, back to the Conferences of the Barons at Runnymede. Impressed by the novel and extraordinary features of the act and the doubts suggested by its perusal, I turn to the organic law as the true test of legislative power, and regardless for the time of the subordinate questions involved in the controversy, proceed to inquire whether its provisions do not fall within the prohibitions of the constitution. I shall assume for all the purposes of this argument, that the prohibitions of the act extend as well to liquors which are the growth and manufacture of foreign countries, as to those which are of domestic *origin.*

Indeed, if we look at its title, to which resort may be had to remove ambiguities when the intention of the lawgiver is not plain, and read the closing sentence of section one, which is thought to exclude foreign liquors in connection with that part of section twenty-two which declares that it shall not be construed " to prevent the importer of foreign liquor from keeping or selling the same to any person authorized by the act to sell such liquors," the intention of the legislature to include both kinds, can hardly admit of a doubt. The exception upon which the uncertainty arises proceeded, doubtless, from a desire that the law should conform to the decision in *Brown* v. *The State of Maryland,* referred to hereafter. And the obscurity and want of precision in the language employed must, upon the usual rules of construction, yield to the intention, when that can be ascertained from an examination of the law itself.

In neither of the cases under consideration, were the defendants impleaded or brought to trial upon the indictment of a grand jury. Indeed, the law contemplates no preliminary inquiry by the grand inquest. The counsel for the defendants insist, that in this respect it is in conflict with that part of section six of article first of the constitution which declares that " no person shall be held to answer for a capital or otherwise infamous crime, (except, &c.) unless on presentment or indictment of a grand jury." This involves an inquiry into the character of the crime created by the act. Is it an infamous crime? Offences which rendered the perpetrator infamous at the common law, were treason, felony, and the *crimen falsi.* It is not easy to define the meaning and extent of the latter term with certainty. It not only involved falsehood, but offences which injuriously affected the administration of justice. It was the infamy of the crime, and not the nature of the punishment, which constituted the *crimen falsi.* Thus a conviction for libel, or for seditious words, or for keeping a gaming-house, did not render a man infamous. (*Wharton's Crim. Law,* 354; 1 *Rus. on Crimes,* 45; 1 *Phil. Evid.,* 28; *Barker* v. *The People,* 20 *Johns. Rep.,* 457; *Peake's Ev.,* 126.) The present constitution was adopted in 1846. At that time the term infa-

The People *v.* Toynbee.

mous crime was and still is defined, in the 2d volume of the Revised Statutes, 587, section 31, to include every offence punishable with death or by imprisonment in the state prison, and no other. Such is also the statutory definition of felony. The framers of the constitution must have understood and intended that others should understand the term in the legal sense then given to it. And it does not embrace the offence created by the act under consideration. It is not, therefore, a valid objection, that the defendants were impleaded and put upon their trial without the indictment of the grand jury.

We have already seen that the object of the law is prohibition. For general and ordinary uses; for all but a few special purposes, liquors having intoxicating properties are to be banished from society, and neither bought nor sold. The trades and employments connected with their importation, manufacture and distribution, are to be suspended or put down, and the interests which supply such trades and employments with capital, raw material, labor and means of transport, are to find other fields of enterprise, or be put down with them. This brings me to consider the principal question discussed upon the argument, which is this: Does the legitimate authority of the legislature extend to the enactment of laws prohibitory of the common and ordinary use of property? Can this department of the government, in the execution of the trusts confided in it, declare by statute an article or thing, the product of human industry or the creation of human skill, long recognized as property, and of all but universal use, and perfectly inoffensive in itself, to be a public nuisance, and thus authorize and justify its destruction? It is worth while, before we proceed further, to inquire what the proscribed article or thing is, to consider its qualities and uses, and whether it is invested with the attributes of property, so as to entitle it to the protection of the constitution.

The taste for intoxicating drinks is thought to be an instinct of our nature, an operation of the principle of organized life, and not an artificial appetite or desire peculiar to races or tribes, and induced by habit, or climate, or other external in-

fluences. History and tradition corroborate the results of chemical and physiological investigation. With the earliest Hebrews, the most ancient Egyptians; with the refined and intellectual Greeks, and the robust and resolute Romans, wine was the favorite beverage, if not a part of the customary food. Among the nations whose empires were upon the shores of the Mediterranean and its adjacent seas, long before the Christian era, the fruit of the vine and the olive, together with the cereal grains, were the staple products of agriculture and the principal articles of trade and commerce. " Savage and civilized tribes, near and remote; the houseless barbarian wanderer, the settled peasant, and the skilled citizen, all have found, without intercommunication, through some common and instinctive process, the art of preparing fermented drinks, and of procuring for themselves the enjoyments and miseries of intoxication. The juice of the cocoa-nut tree yields its toddy wherever this valuable plant can be made to grow. Another palm affords a fermented wine on the Andean slopes of Chili; the sugar palm intoxicates in the Indian Archipelago and among the Molluccas and Philippines; while the best palm wine of all is prepared from the sap of the oil-palms of the African coast. In Mexico, the American aloe gave its much loved *pulque*, and probably also its ardent brandy, long before Cortez invaded the ancient monarchy of the Aztecs. Fruits supply the cider, the perry and the wine of many civilized regions; barley and the cereal grains, the beer and brandy of others; while the milk of their breeding mares supplies at will to the wandering Tartar, either a mild, exhilarating drink, or an ardently intoxicating spirit. And to our wonder at the wide prevalence of this taste, and our surprise at the success with which in so many different ways mankind has been able to gratify it, the chemist adds a new wonder and surprise, when he tells us that, as in the case of his food, so in preparing his intoxicating drinks, man has everywhere come to the same result. His fermented liquors, wherever and from whatever substances prepared, all contain the same exciting alcohol, producing everywhere, upon every human being, the same

exhilarating effects." The wines of France, Italy and Spain, the beer of the German states and the ale and porter of the British islands, enter largely into the domestic consumption of the inhabitants of those countries, as a part of their daily food. With our own citizens, the use of fermented liquors, in some form or other, is all but universal. Either as a beverage or in the preparation of their food, few families are entirely without it. Should these facts suggest the probable result of a movement to quench an appetite so prevalent and so deeply seated by interdicting the use of the means which a wise and beneficent Providence has everywhere furnished for its gratification, they also show that whenever and wherever man rises above the savage condition, and begins to exhibit the rudiments of civilization, intoxicating drinks, and the fruits and plants and grains from which they are expressed or extracted, are among the first things which he separates from the common stores of nature, appropriates to individual use, and impresses with the character and attributes of property. Chemical and physiological science must determine whether alcohol, the essential element of intoxicating liquors, is food for the invigoration, or poison for the destruction, of the human system. The law is only concerned to know whether they fall within the catalogue of things which it recognizes as property. I find no definition of property that does not apply to intoxicating liquor. It has been separated from the common stock of nature for private use. It is that over which man may exercise absolute dominion, to the exclusion of every other person. By many it is regarded as an article of diet; by all, as one of trade. It is bought and sold, lost and acquired, like other property. The law in question treats it as property — authorizes its sale under certain limitations and for certain prescribed uses. And when it speaks of its forfeiture, it means a forfeiture of the right of property. In every sense of the term, it is property, endowed with the same rights and subject to the same measure of control, as other property, and no more.

The learned counsel for the people, in the case against

Toynbee, insists that the legislative department of the state, being founded upon the model of the English Parliament, has power to declare and limit the uses to which property may be applied, and when it shall cease to be property. This power, he argues, results, 1. From the express grant of the constitution; 2. From the general illimitable nature of legislative power required for the ends of society; 3. From being coextensive with the law-making power in a democracy; and, 4. From the fact that discretion, legislative and judicial, is in its nature exclusive and subject to no control. This, doubtless, is a true exposition of the power of the parliament of Great Britain, which is said to be " so transcendent and absolute that it can not be confined, either for causes or persons, within any bounds." So thought Lord Coke, (4 *Inst.*, 36, *and Black.* 1st *vol. Com.*, 140.) Such also is the opinion of Chancellor Kent, (1 *vol. Com.*, 448) in his remarks upon Coke's expression in Bonham's case, and upon that of Lord Hobert, in *Day* v. *Savage,* and of Lord Holt, in *The City of London* v. *Wood.* Names, eminent as jurists and statesmen, are not wanting, who maintain that there are limitations upon legislative power not written in the constitution, which are implied from the nature of popular sovereignty and representative government. I decline to enter that field of inquiry, because for present purposes, and indeed for any purpose designed to secure property and liberty and life from aggression and misrule, the written limitations will be found amply sufficient, if expounded and applied in a liberal and resolute spirit. They come down to us from Magna Charta, and are sanctioned and approved by the wisdom and experience of near seven hundred years, and under our system are intended to save absolute inherent rights from the force of legislative acts which interrupt their enjoyment or impair their value. Among the absolute inherent rights of persons, Mr. Blackstone (*Com., vol.* 1, 138,) enumerates the right of property, which "consists (he says,) in the free use, enjoyment and disposal of all his acquisitions, without any control or diminution, save only *by the laws* of the land. And by a variety of ancient statutes it is enacted that no man's lands

The People v. Toynbee.

or goods shall be seized into the king's hands against the great charter and the law of the land; and that no man shall be disinherited nor put out of his franchises or freehold, unless he be duly brought to answer and be forejudged by course of law." The words " by the laws of the land," and " by course of law," here referred to; and the words " due process of law," found in the sixth section of the first article of the constitution, are synonymous, and have the same legal import and effect. We shall presently see what this is. England has no written constitution, and therefore parliament is said to be so transcendent in its authority. The provisions of the great charter and the acts of later times, for the protection of life, liberty and property, are statutory regulations, which parliament may repeal or modify at pleasure. They are limitations upon the power of the crown, and not upon that of parliament. The masses in Great Britain have never yet attained to the consequence and dignity of a conquest for their absolute inherent rights, except through the legislative and the judicial branches. It is a historical truth, that the struggle there has constantly been to put the real or pretended prerogatives of the crown under restraint, sometimes by the barons as in the time of the great charter; sometimes by the judges, as in the time of Lord Coke; and sometimes by the parliament, and especially the house of commons, as in the times of the great rebellion, and the act for the settlement of the succession in 1688. We have incorporated the prohibitions of the English statutes for the protection of life, liberty and property into our constitution, not as limitations upon executive authority, but as limitations upon legislative power. The same unrestrained dominion over property which the parliament and people of Great Britain have denied to the crown and reserved to parliament, the people of the state of New York have denied to the legislature and reserved to themselves.

The latter clause of section six of the first article of the constitution is in these words: " No person shall be subject to be twice put in jeopardy for the same offence; nor shall he be compelled, in any criminal cause, to be a witness against him-

The People *v.* Toynbee.

self; nor be deprived of life, liberty or property without due process of law; nor shall private property be taken for public use without just compensation." These provisions are not to be narrowed down by a literal construction. They are to be largely and liberally expounded. Their object is to secure the enjoyment of the rights to which they refer, and must have an interpretation which will effect that object. The terms "life," " liberty," " property," and " due process of law," as they stand in the section, become of vital consequence in giving it a construction. To be of any real value they must have a fixed, permanent signification, one that shall remain unchanged by circumstances, or time, or the caprice of those to whom the restraining words of the section may become offensive or troublesome. The legislature may declare what a particular term or expression means when used in a statute. This is a customary and unexceptionable act. But it can not declare what the same term or expression means, and thus enlarge or restrain its signification when used in the constitution. It is of no consequence what the legislature think of it, or what import they attribute to it. The real inquiry is, what did the framers of the constitution mean by it? and what was its known legal definition and signification when the constitution was adopted? The word " property " must comprehend now whatever it comprehended in 1846. Any other rule would place at the absolute disposal of the legislature every right intended to be secured and consecrated by the limitations I have quoted. The right of property, as we have seen, consists in the " free use, enjoyment and disposal." Its incidents are the enjoyment, use and the power of disposition. How are we to designate, classify or define an interest or an estate which can not be used, enjoyed or sold and transferred? By what words and expressions shall we impart to others our idea of its nature and qualities? There can be no property, in the legal and popular sense of the term, where neither the owner, or the person who represents the owner, has the power of the sale and disposition. That which can not be used, enjoyed or sold, is not property; and to take away all or any of these incidents,

The People *v.* Toynbee.

is in effect to deprive the owner of his right of property. This is precisely what the act " for the prevention of intemperance, pauperism and crime," is intended to accomplish, and precisely what it will accomplish if it can be enforced, for it declares that the subject to which it refers shall neither be sold, or kept for sale or with an intent to be sold. The statutes may, and it is their office to, prescribe the forms by which sales may be effected; that the title to real property shall only pass by deed acknowledged before an officer, or attested by a witness; that personal estate shall only pass by delivery in writing or the payment of purchase money; that poisonous drugs, when sold, shall be so labeled. They may also declare, that intoxicating liquors shall not be sold to minors, paupers, or habitual drunkards, or to be drank in the house of the seller, or by retail to be taken out of the house, unless he have a license and be of good moral character, &c. These are mere acts of regulation and conservation, and do not in the least impair the right of property.

There is another right incidental to the right of property which, when abrogated or suspended, tends to the deprivation of property. That is, the right of action, the right to the protection of the laws, and to redress by the legal tribunals. The forms of action and of legal proceedings, the mode by which civil injuries are redressed and rights asserted and defended in the courts, are classed as remedies, and are doubtless subject generally to legislative supervision and control. But when the law-making power comes to deal with the absolute inherent rights referred to in the 6th section of the first article of the constitution, forms and modes of proceeding from being mere remedies rise to the dignity of rights which can not be denied or withheld. The principle is asserted by Mr. Justice Washington, in *Green* v. *Biddle*, (8 *Wheaton Rep.* 1, 75,) in the following language: " Nothing can be more clear, upon principles of law and reason, than that a law which denies to the owner of land a remedy, &c., or which clogs his recovery of possession by conditions and restrictions tending to diminish the amount and value of the thing recovered, impairs his right

to and interest in the property. If there be no remedy to recover the possession, the law necessarily presumes a want of right to it. If the remedy afforded be qualified and restrained by conditions of any kind, the right of the owner may indeed subsist and be acknowledged, but it is impaired and rendered insecure according to the nature and the extent of such restrictions." Blackstone, in his Commentaries (*vol.* 1, *p.* 55,) says; " The remedial part of a law is so necessary a consequence of the two former (the declaratory and directory parts,) that laws must be very vague and imperfect without it. For, in vain would rights be declared, in vain directed to be observed, if there were no method of recovering or asserting those rights when wrongfully withheld or invaded. This is what we mean properly when we speak of the protection of the law." Mr. Justice Taney, in delivering his judgment in *Bronson* v. *Kinzie*, (1 *Howard's Rep.* 311,) and applying this principle to laws which impair the obligation of contracts, says: " Although a new remedy may be deemed less convenient than an old one, and may, in some degree, render the recovery of debts more tardy and difficult, yet it will not follow that the law is unconstitutional. Whatever belongs merely to the remedy may be altered according to the will of the state, provided the alteration does not impair the obligation of the contract; but if that effect is produced, it is immaterial whether it is done by acting on the remedy or directly on the contract itself. In either case it is prohibited by the constitution." In *Holmes* v. *Lansing*, (3 *John. Cases*, 75,) Chancellor Kent, speaking the judgment of this court, says: " so long as contracts were submitted without legislative interference to the *ordinary and regular course of justice*, and existing remedies were preserved in substance and with integrity," the constitution was not violated. And judge Denio, in pronouncing the judgment of the Court of Appeals, in *Morse* agt. *Gould*, (1 *Kernan*, 281,) also says: " It is admitted that a contract may be virtually impaired by a law which, without acting directly upon its terms, destroys the remedy, or so embarrasses it that the rights of the creditor under the legal remedies when the contract was

The People *v.* Toynbee.

made are substantially defeated." With this necessary quali-
fication, the jurisdiction of the states over the legal proceedings
of the courts is supreme. These authorities sufficiently indicate
the distinction between rights and the remedial process of the
law for their vindication when wrongfully withheld or invaded,
and they also define and mark the utmost verge and limit of
legislative power when applying remedies to absolute inherent
rights which the people have reserved to themselves by the
limitations of the constitution. This right of action to redress
and protection, by the venders and owners of intoxicating
liquors, is seriously impaired—if not in effect destroyed—by
the conditions imposed by the latter clause of the 16th section
of the act in question.

Those provisions of this act which I have endeavored to
show tend to the deprivation of property, can not, by any pro-
cess of reasoning, be brought within the meaning of the terms,
"by the laws of the land," and "by course of law," used in
the English Statutes, or the "due process of law," of the 6th
section of article 1, of the constitution. Lord Coke says, that
the words "by the law of the land," mean by the course and
process of law "by indictment or presentment of good and law-
ful men, where such deeds be done in due manner or by original
writ of the common law." "The law of the land, in bills of
rights, does not mean merely an act of the legislature, for that
would abrogate all restraints upon legislative authority. The
clause means, that the statute which deprives a citizen of the
rights of person and property without a regular trial according
to the course and usage of the common law, would not be the
law of the land in the sense of the constitution." *Hoke* v.
*Henderson*, (4 *Dev.* 1.) "The words "due process of law," in
this place, can not mean less than a prosecution or suit instituted
and conducted according to the forms and solemnities for
ascertaining guilt or determining the title to property. It will
be seen that the same measure of protection against legislative
encroachments is extended to life, liberty and property, and if
the latter can be taken without a forensic trial and judgment
then there is no security for the others. If the legislature can

take the property of A and transfer it to B, they can take A himself and either shut him up in prison, or put him to death. But none of these things can be done by mere legislation. There must be due process of law." This expressive language of Mr. Justice Bronson, in *Taylor* v. *Porter,* (4 *Hill,* 140,) has often been quoted and can not be too often repeated. It should be engraven upon the walls of the legislative chambers as a perpetual memorial that there are bounds to legislative authority. Vide, also, the opinions of Judge Denio and of the late Mr. Justice Edwards in *Westervelt* v. *Gregg,* (2 *Kernan,* 202.) "The prescribed forms and solemnities for ascertaining guilt, or determining the title to property," comprehend as well the forms of procedure as the legal presumptions and rules of evidence by which the guilt is to be ascertained or the title determined. These presumptions and rules are also a part of the remedial process of the law, and their alteration and modification is doubtless, to a certain extent, within the power of the legislature; but in cases which affect the personal rights secured by the constitution, the changes must leave the right unimpaired and place no material impediments or obstructions in the way of those who are concerned in asserting it. In trials for crimes, and to enforce penal statutes, the presumption of innocence obtains until it is disproved, in all cases, and in trials to redress civil injuries and enforce civil rights, the presumption of title and right is with the defendant until it otherwise appears, unless in his pleadings he voluntarily assumes the *onus probandi.* In proceedings which aim at the deprivation of liberty and property by fines and forfeitures and the pains of imprisonment, that is not due process of law which reverses the wholesome and humane rules of the common law and substitutes the presumption of wrong and guilt for that of right and innocence. In this respect the provisions of section 17 of the act are highly offensive.

Nor can the force and efficiency of the constitutional limitations be evaded or averted by the declaration of the 25th section of the act, that intoxicating liquors are a public nuisance. In the words of Chief Justice Ruffin, "such a

construction would abrogate all restrictions on legislative authority." If a class of citizens can be deprived of a particular kind of property by a legislative declaration that it is a public nuisance, then another class may be deprived of liberty by a legislative act proscribing them as malefactors and felons. Grant this power to the legislature, and the limitations of the constitution are no longer of any value. Every kind of property may be put without the pale of the laws and the protection of the courts, and exposed to seizure and forfeiture by a simple act declaring the proscribed article to be a public nuisance. The existence of such a power is inconsistent with the theory of a limited representative government, because it is destructive of the ends which such government is designed to accomplish. The 25th section proceeds upon a misapprehension of what a nuisance is. Common or public nuisances are offences " against the public order or economical regimen of the state, being either the doing of a thing to the annoyance of the king's subjects, or the neglecting to do a thing which the common good requires." (4 *Black. Com.* 166.) Impediments and obstructions placed in highways and navigable streams are nuisances *per se,* because they interrupt the passage and thereby annoy others. Trades and manufactures of certain kinds become nuisances from the places where and the manner in which they are conducted. Animals, such as dogs, swine, &c., are not nuisances until they become offensive by being suffered to run at large or kept in the vicinity of men's habitations. So an accumulation of vegetables and fruits in process of decay, the flesh and offal of animals, gun powder, drains and sewers in cities and populous places, may or may not become public nuisances by their localities and other attendant circumstances. The true test is, that the thing, trade or business is in some way detrimental to the public, for the elementary writers say, " common nuisances are such inconvenient or troublesome offences as annoy the whole community in general, and not some particular person." Common nuisances may be abated or removed by the party annoyed or injured

who is not required to wait for the slow progress of the ordinary forms of justice. Liquors that intoxicate exhibit none of the qualities which constitute a common nuisance. They obstruct no navigable rivers, and impede the passage of no public highways. They create no noise to disturb the public tranquility and peace. They exhale no offensive odors to taint the air and impair the public health. Nor do they endanger the security of persons or of other property by a tendency to ignition and explosion. In the stores of the importer, the vaults of the brewer and in the cellars of the wine grower and consumer, they are as harmless as the wood or glass in which they are enclosed. He who knows how to enjoy them with reason and moderation, or has the moral courage and self-denial to let them alone, may consider himself free from annoyance and danger. They may be, and doubtless are, converted to base uses—uses which produce " intemperance, pauperism and crime," and, I may add, moral degradation and grief, and anguish unspeakable. And then the places where they are *thus* used and those concerned in prostituting them to such uses, fall clearly within the province of legislative regulation and control, and the maxim: *Sic utere tuo ut alienum non lædas,* applies in all its force. But intoxicating liquor can not be deprived of the defences with which the constitution surrounds the property of the citizen by an act proscribing it as a public nuisance.

There are some observations of Justices Taney and Woodbury, in the opinions delivered by them in the cases against the states of Massachusetts, Rhode Island and New Hampshire, (5 *Howard,* 504,) which are thought to favor the idea that the states may pass laws prohibitory of the uses and sales of ardent spirits, subject to the right of importation and of sale by the importer. Those who attach any value to expressions which are *obiter dicta* and not necessary to the decision of the precise question under examination, will do well to remember that the language referred to asserts the absence of any thing in the constitution of the United States which forbids the passage of prohibitory laws, and nothing more. The cases in which the

The People *v*, Toynbee.

observations occur determined that the excise laws of the several states named in the proceedings did not conflict with the authority given to congress to regulate commerce with foreign countries and among the several states, and nothing else. The power of a state exercising its sovereign authority, is that to which these learned judges refer; but the power of a state legislature, exercising its authority under such restraints and limitations as its constituents may have imposed upon it, is quite a different thing, and one which they did not consider. The question here is not what the legislature might do were these limitations removed or modified, nor what the people of the state might do by an amendment of the organic law, but what the legislature may now do with the limitations in full force.

A distinction has also been suggested between the power of the legislature over property in liquors acquired and existing at the time the act took effect, and property in liquors acquired afterward. The act itself recognizes no such distinction, and does not discriminate between present and future acquisitions, but applies its penalties, forfeitures and disabilities with unsparing rigor to those who now own and to those who may hereafter own such property. In this respect I think it entirely consistent with itself, for a constitutional security which does not cover future as well as present acquisitions is of no practical value, and will afford no sort of guaranty against intentional or mistaken aggression. Here are a class of citizens who have invested their property and spent the best years of their lives in learning and establishing a particular business or trade, inoffensive and commendable in itself—the growth and manufacture, it may be, of wine, the culture of barley and hops, the manufacture of firearms and gunpowder, the fabrication of types, printing presses and paper, and then comes a legislative act, confessing its incompetency to invade or disturb existing interests, and declares that because wine and the decoction of barley and hops may lead to intoxication, firearms and gunpowder to war, bloodshed and the destruction of human life; and types, printing presses and paper to blasphemous, libelous amd obscene publications, all future acquisitions of the

kind shall cease to be regarded as property, and be no longer entitled to claim the benefit and protection of the laws. Let this fancied distinction between present and future acquisitions once obtain, and property will not hereafter depend for its security upon a permanent rule of constitutional law, but upon legislative moderation and forbearance, and such limitations as legislative wisdom and discretion may put upon its own authority. But let us look upon this distinction in another aspect. *Brown* v. *The State of Maryland*, (12 *Wheaton*, 419,) decides that a state law requiring importers of foreign goods, (including liquors) to take out a license, before proceeding to sell by the bale or package, is repugnant to the constitution of the United States and void. In other words, that a state has no power to prohibit sales of foreign goods by the importer in the bale or package in which they were imported. It was argued, in behalf of the state, that whenever the goods entered its jurisdiction, the power of congress ceased and that of the state was substituted in its place. Chief Justice Marshall answered the argument in this wise: " Commerce is intercourse One of its most ordinary ingredients is traffic. It is inconceivable that the power to authorize this traffic, when given in the most comprehensive terms with the intent that its efficiency should be complete, should cease at the point where its continuance is indispensable to its value. To what purpose should the power to allow importations be given unaccompanied with the power to authorize a sale of the thing imported. Sale is the object of importation and is one essential ingredient of that intercourse of which importation constitutes a part. It is as essential an ingredient, as indispensable to the entire thing, as importation itself. It must be considered as a component part of the power to regulate commerce. Congress has a right not only to authorize importation, but to authorize the importer to sell." Here, then, is a positive affirmation that the right to sell, by the importer, is a component part of the power to regulate commerce, and that congress may, in disregard of state legislation, authorize the importer to sell. Now, the right to sell by the importer implies the right to purchase by some other

The People *v.* Toynbee.

person, because there can be no sale if there is no person to purchase. Had the state of Maryland, in place of prohibiting sales by the importer gone farther and prohibited purchases from the importer by its own citizens, can there be a doubt that such a prohibition to purchase would have been held equally void as the prohibition to sell, and equally hostile to this exclusive right of congress to regulate commerce? When, therefore, a citizen of the state of New York becomes the purchaser of foreign liquor from the importer, he acquires a right of property under the paramount law of the United States as sacred and secure from legislative invasion and agression as rights of property which were vested at the time the law under consideration took effect.

If the judgment in the case of *Brown* v. *The State of Maryland*, and the reasoning of the chief justice, is entitled to any weight as authority, it is decisive of the question so far as sales of foreign liquors by importers is concerned. The right of importation, we see, means the right to introduce foreign goods into the country, and to sell them to those who may choose to become purchasers. If state legislation can substantially take away from the mass of its citizens the power to become purchasers, a state can in effect impede foreign trade and put an end to foreign importations. It has only to declare, what the act under examination declares, that the importer shall only sell in the original packages, to such persons as the state may license and authorize to become purchasers. Sale is no longer incidental to importation. The importer's right to dispose of his goods in the market no longer depends upon the authority given to congress to regulate commerce and intercourse with foreign countries. But it depends also upon the disposition of the states to suffer their citizens to become purchasers of foreign commodities. I am unable to perceive any difference between state resistance to foreign importations by interdicting sales by and purchases from the importer, and resistance by a preventive force stationed upon its own borders. Either mode is an unwarrantable interference with a subject of legislation over which congress has exclusive control and dominion.

The laws which prohibit intermural interments, referred to upon the argument, stand upon the intelligible and constitutional ground of police regulations to prevent nuisances. (*Coats* v. *The Mayor, &c. of New York*, 7 *Wendell*, 585.) And the statutes which authorize the destruction of buildings to arrest the progress of fire or the ravages of pestilence, are justified by the law of overruling necessity, and is the exercise of a natural right to avert a great public calamity. (2 *Kent's Com.* 338; *Russell* v. *The Mayor of New York*, 2 *Denio*, 461.)

I therefore arrive at the conclusion, that so much of the 1st section of the act under consideration as declares that intoxicating liquor shall not be sold, or kept for sale, or with intent to be sold, except by the persons and for the special uses mentioned in the act; so much of sections 6, 7, 10 and 12, as provide for its seizure, forfeiture and destruction; so much of the 16th section as declares that no person shall maintain an action to recover the value of any liquor sold or kept by him which shall be purchased, taken, detained or injured, unless he prove that the same was sold according to the provisions of the act, or was lawfully kept and owned by him; so much of section 17 as declares that upon the trial of any complaint under the act, proof of delivery shall be proof of sale, and proof of sale shall be sufficient to sustain an averment of unlawful sale; and so much of section 25 as declares that intoxicating liquor, kept in violation of any of the provisions of the act, shall be deemed to be a public nuisance, are repugnant to the provisions of the constitution for the protection of liberty and property, and absolutely void.

The proceedings in both cases should be reversed and set aside, and Philip Berberrick is discharged from his arrest.

S. B. STRONG, J.—This cause comes before us on an appeal by the defendant from a judgment rendered against him by a police justice of the city of Brooklyn, for the alleged violation of the statute for the "prevention of intemperance, pauperism and crime," commonly called the prohibitory act. The complaint was preferred before the justice by a policeman, pursuant

to the 12th section of the statute. It stated, in substance, that on the 17th of July, 1855, the defendant sold, and kept for sale, and had in his possession with intent to sell, in Montague street, in the third ward of said city, intoxicating liquor, to wit, brandy and champagne, in violation of the said statute; and that said offence consisted in selling one glass of brandy, and one bottle of champagne. When the defendant was brought before the justice, his counsel moved that he should be discharged, on the grounds that it did not appear by the complaint that any crime or offence whatever had been committed; and that the act under which the prosecution had been instituted is unconstitutional and void. The motion was denied. The defendant then said that he did not request to be tried by a court of Special Sessions, but that he objected thereto, and offered to give bail to appear at the next court having criminal jurisdiction. The justice overruled the objection, declined to receive such bail, and required the defendant to plead to the charge.

The defendant thereupon pleaded not guilty. A trial was immediately had before the justice, without a jury; the defendant was convicted, and sentenced to pay a fine of fifty dollars and the costs; and it was adjudged that the intoxicating liquor should be forfeited. The defendant's counsel objected before the justice that the complaint was defective, because it did not aver that the liquors alleged to have been sold were not liquors, the right to sell which in this state is given by any law or treaty of the United States. If such an averment was necessary, the justice should have dismissed the complaint by reason of the omission. The statute does not direct what the complaint shall contain, and that is, of course, left to the rules of the common law.

The complaint is a substitute for an indictment, so far as it relates to substance, and requires, at least, as much particularity; indeed, the authorities say more. Mr. Chitty, in his approved work on criminal law, (*vol.* 1, *p.* 281-2,) says: " It is a general rule that all indictments, upon statutes, especially the most penal, must state all the circumstances which constitute the definition of the offence in the act, so as to bring the de-

fendant *precisely* within it." " And, " he adds, " not even the fullest description of the offence, were it even in the terms of a legal definition, would be sufficient without keeping close to the impressions of the statute." In the case of the *People* v. *Allen*, (5 *Denio*, 79,) Beardsley, C. J., says " an indictment upon a statute must state all such facts and circumstances as constitute the statute offence, so as to bring the party indicted precisely within the provisions of the statute. If the statute is confined to certain classes of persons, or to acts done at some particular time or place, the indictment must show that the party indicted, and the time and place" where and " when the criminal acts were perpetrated, were such as to bring the supposed offence directly within the statute." There can be no doubt as to the principle; it is reasonable and proper, and is not controverted by any respectable authority. The first section of the statute under consideration enacts that intoxicating liquors, except as thereinafter provided, shall not be sold or kept for sale, or with intent to be sold, by any person for himself or any other person, in any place whatsoever. Those expressions are certainly very broad and comprehensive, and they are not so restricted by their reference to subsequent exceptions, as to make any negation of such as are included in other sections a necessary part of the description of any alleged prohibition. (*Popham*, 93-4; *Hawkins*, *b.* 2, *ch.* 25, *s.* 113.) The last clause of the first section, however, declares expressly that the *section itself shall not apply* to liquor, the right to sell which in this state is given by any law or treaty of the United States The statute does not forbid the sale of all intoxicating liquors A large class certainly is exempt from the prohibition. It is not necessary that I should consider, in discussing this point, how far the qualification extends, but it is material to the decision of another point involved in this case, and I may as well express my opinion about it here.

The question which has been agitated upon this point is, whether the exception refers to foreign liquors only while in the hands of the importers, and contained in the original cask or vessel, when, according to the decisions of the Supreme

The People *v.* Toynbee.

Court of the United States, the right of sale is given by congressional legislation, or to such liquors at all times and in whatever condition they may be—in other words, whether it refers to the liquors *themselves* or to their *status*. It must be admitted that the language is susceptible (and I think equally susceptible) of either interpretation. In these cases, the rules of construction are different, according to the character of the statutes—whether they are purely remedial or penal. The former is entitled to a liberal, while the latter is confined to a strict construction. A statute is purely remedial when it furnishes additional means of redress to an existing wrong. In criminal cases it applies to something that is already *malum in se* or *malum prohibitum*. It is then creative of the remedy only. As all are in favor of the due punishment of acknowledged crime, we readily admit that statutes designed for that purpose are entitled to a favorable construction. But it is otherwise when the statute creates a new offence. It is then an innovation, often an encroachment upon previous rights, and its correctness or justice is not always conceded, or generally admitted. The rule is, therefore, very properly, that such a statute should be construed strictly; that nothing should be deemed a crime under it but what is clearly and unequivocally defined. No man should be punished for an act (previously lawful) under a new statute, unless it clearly announces to him, beyond any reasonable doubt, that it is criminal. Now the statute under consideration is creating a new offence. True, it was a misdemeanor before, to sell strong or spirituous liquors or wines in quantities less than five gallons without a license. But the offence under the Revised Statutes was only a part of what was rendered a crime under the prohibitory act, and as the latter is integral, it is in effect new, and must be so considered. Applying the principle of construction I have endeavored to illustrate to the qualifying clause of the first section, and taking that by itself, the prohibition would not extend to imported liquors at all. But there is another rule in giving a construction to an expression in a statute equally indicative of two varied meanings, and that is,

that the whole enactment must be considered, and if one of the interpretations is consonant to the other provisions and the main scope and design of the act, and the other not, that which is consistent shall prevail. It is not then a question of strict or liberal construction, but the preponderance produces reasonable certainty. Now, no one who reads the act in question, and considers its object, can hesitate a moment in coming to the conclusion that the legislature intended to prohibit mainly the sale of imported liquors as a beverage. Indeed, the statute would be wholly ineffectual if it did not go to that extent. Instead of being an extension it would be a relaxation of the old system. I think, therefore, that the true way of reading the first section, is as *a prohibition of the sale of intoxicating liquors, not vendible beyond state legislation, in their existing condition, according to the decisions of the Supreme Court of the United States.* But to whatever extent the vendible liquors may go, their express exemption qualifies the description of those included in the prohibition. Men may still sell intoxicating liquors, all that is charged in the complaint, and yet not be guilty of any offence. It is undoubtedly true that when a statute contains provisos and exceptions, in distinct clauses, it is not necessary to state in an indictment that the defendant does not come within the exception, or negative the provisos it contains. The reason given is, that these are matters of defence, which it is necessary that the accused should aver and prove. But that principle does not apply where, as in this case, the enacting section declares that it is inapplicable to the excepted matters. The statute does not, then, constitute them the subjects of offence; and it is not necessary for the accused to aver or prove any defence until there is proof that he is guilty of what is condemned. In the case of *Rex* v. *Jarvis,* cited in a note to *Rex* v. *Stone,* (1 *East.* 639,) Lord Mansfield said that where exceptions are in the enacting part of the law, it must appear *in the charge* that the defendant does not fall within any of them. And Foster, J., who was an eminent criminal lawyer, remarked that " where negatives are descriptive of the offence, then they must be set forth."

The People *v.* Toynbee.

The rules which I have stated are applicable to indictments which are preferred by a grand jury, and where the accused may have the benefit of a fair and deliberate trial by jury. But a greater degree of strictness is required in summary proceedings before an inferior jurisdiction, which does not afford to the defendants those advantages that the common course of law allows them. In such cases Mr. Chitty says, (vol. 1, p. 284,) it is necessary to show by negative averments that the defendants are not within any of the provisos or exceptions of the statute. It does not cure the difficulty that the defendant is charged with having sold liquors contrary to the form of the statute. That will not aid a defective description of the offence. Nor can the defect be cured by evidence. The evidence must be confined to the charge, and the accused can not be required to answer any complaint except that which sets out an offence conformably to the rules of law. My conclusion upon this point is, that the complaint was radically defective, and that a conviction upon it can not stand.

The next objection to the proceeding before the justice is, that by refusing the defendant's tender of bail for his appearance at the next court having criminal jurisdiction, there was in effect denied to him the constitutional right to be tried by a competent jury. The result of the denial was, that if the defendant had been tried by a jury it must necessarily have been before one consisting of six persons, out of twelve to be summoned by the constable.

The jurors for our courts of Special Sessions are generally taken from the immediate neighborhood, and are liable to be influenced; and their verdict is sometimes controlled by the bias created by a public accusation for the commission of a crime in their own vicinity. They are ordinarily selected too by an officer who has had an agency in the preliminary steps against the accused, and who, as is sometimes the case with police officers, may be anxious to procure his conviction. Whereas, the jurors of our higher courts of criminal jurisdiction are de. signated by responsible town officers; their names are deposited in a box kept by the county clerk, and are drawn by him in the

presence of some of the county officers, and they are taken from the whole county.  These measures are taken for the purpose of having intelligent and impartial jurors, and they are generally effectual.  Besides, it is a matter of some importance to the accused whether his character, his liberty and his property are made dependent upon the verdict of twelve or six men.  Innocent men have sometimes escaped from the worst of punishment by the voice of a single juror; and in such cases the larger number of course affords the greater protection. It is true, too, that the chance of escape of the guilty is increased by the same means.  But in the administration of justice it is at least as essential to protect the innocent as to punish the guilty.  The right claimed by the defendant is an important one, and if his claim was well founded, the subsequent proceedings should not have been had, and the judgment resulting from them against the accused was void.

On looking over the entire statute, it seems to me that the provisions relative to the trials under it indicate an intent to confine them to the Special Sessions.  The magistrate who issues the original process constitutes the court; they are identical.  The fifth section provides that such court shall not be required to take the examination of the accused, but *shall* proceed to trial as soon as the complainant can be notified. The provisions of the act relative to appeals apply exclusively to judgments in the courts of Special Sessions, and are mostly inapplicable to trials before the General Sessions, or Oyer and Terminer.  Many of them are very important.  The right of appeal is given to the complainant as well as the defendant. If the defendant appeals, he is required to give a satisfactory bond that he will not, during the pendency of the appeal, violate any of the provisions of the statute.  The ordinary power of amendment of the apellate court is considerably increased, and any judgment or verdict against evidence may be reversed on appeal, as, (in the words of the statute) " in civil actions."  It is not material to inquire here whether verdicts against evidence in civil actions can be reversed on appeal.  I am considering the provision simply as indicative of the inten-

The People *v.* Toynbee.

tion of the legislature. Now if it was designed by constituting offences under the act, misdemeanors, to confer the right to try the accused in the courts of General Sessions and Oyer and Terminer, the legislature would, I think, have made the provisions relative to appeals applicable to those courts also, otherwise their work would have been but half done. There are other provisions in the statute indicating a design that all trials under it should be had in the Special Sessions, and not any to the contrary. The rule in these cases is, that when the statute creates a new offence, and particularly describes a method of trial and a punishment adequate to the offence for its violation, the complainants, whether the public or individuals, are confined to the remedies expressly given in such statute.

I am, therefore, inclined to agree with the justice in the conclusion to which he arrived, that so far as the statute went, he could not be required to take the proffered bail. But the more important question arises whether the (in effect) denial of the privilege claimed by the defendant is not violative of the constitutional right of trial by jury. If it be so, the enactment, so far as it relates to compulsory trials in the courts of Special Sessions, is void.

The constitution of this state, which went into operation in 1847, ordains (*art.* 1, § 2) that the trial by jury in all cases in which it has been heretofore used, should remain inviolate forever. The language is strong and evinces the importance which was justly attached to the privilege. The terms used in the constitution must be applied according to their meaning at common law, unless a different interpretation is clearly indicated. There is no evidence of any different intent in reference to this provision, nor can any be inferred. A jury, by the rules of the common law, must consist of twelve men. It was therefore very properly remarked by Johnson, J., in *Cruger v. The Hudson River Rail Road Company,* (2 *Kernan's R.* 198,) that the constitutional provision which I have quoted, imports a jury of twelve men, whose verdict must be unanimous. In reference to the cases to which it refers, and whether they include the subsequently created cases, I will quote from an

opinion in the case of *Wood* v. *The City of Brooklyn*, (14 *Barb. R.* 432,) because it expresses my present sentiments on this subject. " This provision relates to classes and of course includes the individual cases which they comprise. In no other way can constitutional enactments preserve that continued efficacy which is so essential for the public good. Whenever, therefore, a new case is added to a class it becomes subject to its rules. A crime newly created is subject to any constitutional regulations relative to the class of crimes generally. The constitutional provision refers to usage, and that must control and define its application. It is a matter of public notoriety that accusations for crimes have generally been tried before a jury. If there have been exceptions they have not been sufficiently numerous to affect the general usage. The introduction of a new subject into a class renders it amenable to its general rules, not to its exceptions, unless there is something peculiar calling for that application. To allow the legislature to except from the operation of a constitutional provision by direct enactment a matter clearly falling within its meaning, would sanction a fraud upon the organic law, and might in the end destroy its obligation." These remarks were originally applied to penalties, but in the quotation I have substituted crimes to which they are alike applicable. The sentiments were expressed by me in 1852, and I cite them with the greater satisfaction as they have recently received the concurrence of three of my brethren. The same principle was applied by Chancellor Walworth to the crime of murder in the case of the *People* v. *Enoch*, decided by the court for the correction of errors. (13 *Wend.* 159,) In his opinion in that case he made the following remarks: " Malice was implied in many cases at the common law, where it was evident that the offenders could not have had any intention to destroy human life, merely on the ground that the homicide was committed while the person who did the act was engaged in the commission of some other felony, or in an attempt to commit some offence of that grade. This principle is still retained in the law of homicide, and it necessarily follows, from the principle itself, that as often as the legisla-

The People *v.* Toynbee.

ture creates new felonies or raises offences which were only misdemeanors at the common law to the grade of felony, *a new class* of murder is created "—(it would probably have been more accurate to have said the previously existing class was enlarged)—" by the application of this principle to the case of a killing of a human being, by a person who is engaged in the perpetration of a newly created felony. The court and jury in such cases immediately *apply the common law principle* and the killing is adjudged to be murder or manslaughter, according to the nature and quality of the crime that the offender was perpetrating at the time the homicide was committed." There could not be a stronger case to illustrate the rule that newly created crimes are subject to the incidents of the class into which they are introduced, without any express provision to that effect in the statute. By the terms of the prohibitory act the offence imputed to the defendant was characterized as a misdemeanor. The usage in criminal cases prevailing immediately before and at the time of the adoption of the constitution, and to which it refers, was undoubtedly conformable to the provisions of the Revised Statutes which had been in operation since 1830. (2 *R. S.* 711, § 2, 3.) Pursuant to those provisions persons accused of misdemeanors had the *right* in *all cases,* to give bail for their appearance at the next court, having criminal jurisdiction, which must be either the General Sessions or Oyer and Terminer, and in their doing so, or, what was equivalent, making an *offer to* that *effect, which* was refused, a court of Special Sessions could proceed no further. That, in effect, secured to the accused, at their option, the right to be tried by a jury of twelve men, and to be exempt from punishment except by their unanimous verdict. That right was denied to the defendant in the case under consideration. If the prohibitory act called for such a denial it contravened the constitutional ordinance and was so far void; or if it impliedly permitted the continuance of the privilege it should have been accorded to the defendant on his demand. So that *quacunque via data,* this objection is fatal to the conviction.

The only remaining question which I deem it proper to con-

The People v. Toynbee.

sider, is: Whether the act in question, so far as it purports to prohibit the sale of intoxicating liquors to be used as a beverage, is valid. The objection urged against that feature of the act is that it is an exercise of despotic power, calling for an unconstitutional interference with the *rights of property*. All civilized nations agree in asserting the rights of property, and holding them sacred, as essential to the prosperity and happiness of man. Sir William Blackstone says (2d Com. 2,) that " there is nothing which so generally strikes the imagination and engages the affections of mankind as the right of property, or that sole and *despotic dominion* which a man claims, and exercises over the external things of the world, in *total exclusion* of the right of *any other individual* in the universe; " and Chancellor Kent well remarks (2d Com. 319,) that " the sense of property is generously bestowed on mankind for the purpose of rearing them from sloth and stimulating them to action; and so long as the right of acquisition is exercised in conformity with the social relations, and the moral obligations which spring from them, it ought to be *sacredly protected.* The natural and actual sense of property pervades the foundations of social improvement. It leads to the cultivation of the earth, the institution of government, the establishment of justice, the acquisition of the comforts of life, the growth of the useful arts, the spirit of commerce, the productions of taste, the erections of charity, and the display of the benevolent affections." There are, undoubtedly, visionary theorists who advocate the community of property in small societies; but the general sense of mankind indicates that civilized society can not exist when the right to separate and distinct property does not prevail, or is not sacredly protected. The people of this state have shown their appreciation of the rights of property in their organic law by declaring (art. 1, p. 6,) that " no person shall be deprived of life, liberty or property, without due process of law." We are thus as effectually protected in the enjoyment of our property as of our own lives or our liberty. *The protection given to property as well by the sense of mankind as by positive enactment makes no distinction as to its*

The People *v.* Toynbee.

*greater or less utility. It extends to whatever has been held and enjoyed as such by custom and usages of the country. No power is given to any man or body of men to discriminate.* We hold our property independently of the varying and sometimes capricious estimates of our fellow men. So universal has been the sentiment in favor of the right, and the determination to support it, that the act in question is, with a single exception, the only instance of an attempt to legislate any species of property substantially out of existence. The exception to which I allude, is the original abolition of slavery by statute. That institution, however, did not exist, nor were slaves considered as property at common law. If they had been, it might have been a grave question whether their owners could have been deprived even of such property without compensation. But, at any rate, that was an extraordinary case, having reference to what was generally admitted to be the original rights of man, which the statute was designed to enforce, and can not be considered as a sanction for the violation of the constitutional protection of property. The protection of any species of property must necessarily extend to its essential and definitive characteristics, especially those which constitute its main value. * * * Otherwise it might be rendered useless in the hands of the possessor, and its protection would be wholly illusory. One of the essential characteristics of property is its vendibleness, especially for the principal use to which it can be appropriated. That necessarily results from the despotic dominion over it which Blackstone ascribes to the possessor. Chancellor Kent says (2d *Com.* 319,) that the exclusive right of using and transferring property follows as a natural consequence from the perception and admission of the right itself, and for this he quotes Grotius (b. 2, ch. 6, sec. 1,) and again the same learned commentator says, (p. 320, vol. 2,) "The power of *alienation* of property is a *necessary incident to the right*, and was dictated by mutual convenience and mutual wants." This is so entirely in accordance with the general sentiment of mankind and the universal practice, that it can not be disputed; so far as my information or recollection

extends, the present is the first and only attempt to interfere with, and prevent the general right of sale of any species of property. That the manner of selling it may be regulated so long as the right is essentially preserved, there can be no doubt. It is upon this principle that our former laws regulating the sales of spirituous liquors were passed. They were, however, by no means prohibitory of the right. Every man was at liberty to sell in quantities exceeding five gallons, and a selected class in any quantity. Upon the same principle sales at auction of goods generally, sales by peddlers and sales by apothecaries of poisonous drugs have been regulated, and sales of deteriorated and unwholesome provisions have been prohibited. These were merely police regulations, and it did not interfere with the ordinary sale of any property in its appropriate condition. So, too, it is competent for the legislature to prohibit the abuse of property so as to make it peculiarly dangerous or deleterious to society. It is on this principle that laws have been passed to prevent the storing of gunpowder in cities, to regulate the construction of buildings so as to prevent unnecessary exposure of lives in crowded places, and to suppress gambling in lotteries or otherwise. In none of these instances is there any interference with the ordinary use of property. There is also a power to prevent or abate nuisances. But to that there must necessarily be a limit. It can not be extended to the general destruction of any species of property, or of its organic characteristics. If it could go thus far none would be safe. The use of animal food, tea, coffee and fruits, each of which is considered by many to be deleterious, might be prohibited. As the legislature has confessedly the power to adopt police regulations so as to prevent the abuses of property, it may be asked where are the limits to which it can be legitimately applied, and by whom are such limits to be prescribed? It may be very difficult in many cases to draw the line, but that can be no reason for claiming an unlimited power.

*The right is simply one of regulation not of destruction.* When an enactment is clearly destructive of a right, and not simply reformatory of its abuses, there can be no question as

The People *v.* Toynbee.

to its invalidity. There is no reason for claiming discretionary power in such cases. That can be invoked only in cases of doubt. It can be no sufficient reason for acting clearly wrong in any particular matter that the exact line of separation between the right and wrong can not be easily defined. Upon the whole my impression is, that the right of property extends not only to its corpus, *but to its ordinary and essential characteristics,* of which the right of sale is one, and that it can be controlled only so far as to prevent its abuse, without destroying such characteristics.

It must be conceded that an unlimited and unrestricted power to take the life, the liberty or the property of our fellow man is despotic. And it matters not whether it is lodged in the hands of one or many, or whether the depositories are elective or hereditary, the character is the same. It was contended on the argument by the counsel for the people, that the legislature of this state possesses despotic legislative power by reason of the general constitutional grant. * * * * To that I can not assent. It is undoubtedly true that absolute power exists originally in the people constituting a distinct and separate community. It is competent for them to establish for themselves a despotic government in one man, or many men, if they should choose to do so, although an intention to confer absolute power can never be inferred, and certainly not in a country claiming to be free. But the people of this state when they entered the union deprived themselves of the power of establishing any other than a republican form of government. (*Const. of the U. S. art.* 4, § 4.) There is not perhaps any very accurate description of a republican form of government, but it is generally understood that it can not be subject to a despotism in any of its public functionaries. The man who is the subject of despotic power, and I care not whether it be in the legislative or executive department, is a slave and not a republican. Liberty and despotism can never exist together. No general grant would confer an unlimited power over the lives, the liberty or the property of the citizen. It was well remarked by Judge Story in *Wilkinson* v. *Leland,* (2 *Peters,* 657,) that " the funda-

mental maxims of a free government seem to require that the rights of personal liberty and private property should be held sacred.   At least no court of justice in this country would be warranted in assuming that the power to violate and disregard them—a power so repugnant to the common principles of justice and civil liberty—lurked under any general grant of legislative authority, or ought to be implied from any general expressions of the will of the people."   And Judge Bronson said in *Taylor* v. *Porter,* (4 *Hill,* 145,) " The security of life, liberty and property lies at the foundation of the social compact, and to say that the grant of legislative power, includes the right to attack private property, is equivalent to saying that the people have delegated to their servants the power of defeating one of the great ends for which the government was established.   If there was not one word of qualification in the whole instrument, I should feel great difficulty in bringing myself to the conclusion that the clause under consideration " (conferring legislative power in general terms) " *clothed the legislature with despotic power. Neither life, liberty nor property, except when forfeited by crime, or when the latter is taken for public use, falls within the scope of the power.*"   But, as I have already remarked, the constitution of this state provides expressly that no person shall be deprived of life, liberty or property, without due process of law.   This provision is general and applies to and of course limits the power of the legislature.   That body can no more deprive any one of his property without due process of law than can a private individual.   An act of the legislature is not the due process of law mentioned in the constitution.   Those words, as was remaked by Judge Bronson in the case last cited, " can not mean less than a prosecution or suit instituted and conducted according to the prescribed forms and solemnities for ascertaining guilt or determining the title to property."   In other words, a man can not be legislated out of his life, liberty or property.

That intoxicating liquors were property at the time of the adoption of our state constitution there can be no doubt.   They had been for many ages i general use, as well by the prudent

and the virtuous as by the reckless and the vicious. To have denied to the former his cheerful glass of cider, or to the laboring man, when worn down with fatigue, the support of his customary restorative, would have excited as much astonishment and created as much resistance in the old time, as would the denial of tea or coffee to our ladies at the present day. Whether those who have gone before us, including the greatest, wisest and best of their days, were right in thus indulging their tastes, or whether their conduct was indiscreet and deserved to be characterized as *criminal,* according to the opinion of modern reformers, are not questions for the consideration of the judiciary. I allude to the former practice to show that intoxicating liquors were property with the general assent of mankind.

It was said by Chief Justice Taney in the license cases from Rhode Island, New Hampshire and Massachusetts, (5 *Howard,* 577,) that " spirits and distilled liquors are *universally admitted* to be subjects of *ownership* and *property* and *therefore* subjects of *exchange, barter and traffic, like any other commodity in which a right of property exists;*" and Catron, J., remarked, in the same cases, that " *ardent spirits have been for ages and now are subjects of sale, and of lawful commerce, and that of a large class throughout the civilized world, is not open to controversy.* So our commercial treaties with foreign powers declare them to be, and so the dealings in them among the states of this Union recognize them to be." That such liquors are property still admits of no doubt. Their importation from foreign countries is expressly sanctioned, and they are heavily taxed by congressional legislation. If the acts of congress had been legitimately passed by the legislature of this state, we shou'd have been virtually precluded from denying the characteristics of property to what we had directly admitted within our borders and subjected to taxation. The faith of states, which should ever be preserved inviolate, would have forbidden it. We are equally, though possibly not as directly, included by the acts of a general government, of which by our own volition we

are a member.  Intoxicating liquors are still freely admitted and heavily taxed; and their sale by the importers while in the cask or vessel in which they were introduced into the country, and their purchase by any one, are authorized beyond the reach of state legislation.  It is true that their subsequent sale was, at the time of the adoption of our state· constitution, subject, and no doubt lawfully subject to the regulations contained in our excise laws.  The Supreme Court of the United States has decided on various occasions that state laws regulating the sales of intoxicating liquors are not prohibited by the constitution or laws of the United States.  Some of the judges in the license cases from three of the New England states, to which I have alluded, expressed opinions that state laws prohibiting entirely the sale of intoxicating liquors might not conflict with the powers conferred upon, and exercised by the general government; but the decision of that question was unnecessary, as it was admitted by the judges that the statutes of those states were not prohibitory.  The remarks of those learned judges as to the right of the states to pass laws prohibiting the sale of foreign liquors had no reference to the·limitation of the power of the legislature of the states by their own constitutions; and, besides, they were mere *obiter dicta*, as they were upon a question not at all involved in the cases before them, and would not, according to a rule they had laid down for their own conduct, at all control them or the court of which they were members, in any future determination.  From the considerations to which I have alluded, I have no doubt but that imported liquors are still, as they always have been, property.

As to liquors of domestic origin, there are other and possibly more difficult questions.  The control of the state over them has not been, nor unless they are introduced from other states can it be, subject to congressional legislation.  Whether it is competent for the legislature to prohibit their manufacture in this state is not now a question, as that has not been done.  They can yet be lawfully manufactured, and when manufactured are still property, and as such are equally with imported

The People v. Toynbee.

liquors protected by the ægis interposed by our state constitution.

It is clear, as I have before intimated, that the protection to property extends to and includes its generally conceded characteristics, especially those without which it would be valueless; otherwise it would be but nominal and scarcely that. It was contended, however, by the counsel for the people, that the sale of intoxicating liquors was not prohibited by the statute; that any of them might be sold for medicinal, manufacturing and sacramental purposes, and that foreign liquors might be sold by the importers in the original cask, or vessel, to any one. The perm tted sales would be very inconsiderable. And the statute if carried into full, and its designed, operation would effectually prevent its use as an ordinary beverage by the great mass of the people — the use for which it was mainly designed, and without which it would be of little or no value. It might be accessible to the wealthy, but would be unattainable by men of moderate means. That would create a distinction between the rich and the poor which should ever be avoided in legislation, if it is desirable that our laws should be respected or enforced. It is no matter what may be the pretence, the denial would be a restriction; and that to be just, should operate upon all, if not equally, the inequality should not be the direct and palpable effect of the statute. I consider the statute in question as mainly prohibiting the sale of intoxicating liquors as a beverage, and destructive of its principal value, and with that impression I must adjudge it to be null and void to that extent.

The inviolability of the rights of private property is subject to the prerogative resulting from the eminent domain always existing in the sovereign power to take it for public purposes, on paying an adequate compensation to the owner. But the compensation must consist of a direct and specific remuneration, and not merely of the general good conferred upon the community by the passage of a beneficent law. The prohibitory law does not, nor from the nature of the case could it, make any direct compensation to the owners for the property which it is proposed to sacrifice.

The People *v.* Toynbee.

So, too, there is necessarily reserved the right of taxation; but the exercise of such right, although it requires the contribution of a portion of what belongs to the citizen, in effect rather increases than diminishes the value of the entire property, by the security which it enables the public to give to all that is retained.

The interest in the question as to the validity of the prohibitory law is not confined to those only who may own the property which it is proposed in effect to render unavailable to the proprietor. It extends to the entire community. If the shield of constitutional protection can be withdrawn from one species of property, any other may be successfully assailed under some specious pretences, or indeed without any at all. It is by no means a sufficient answer to this to say that the power over property which is now claimed in behalf of the legislature, would not be liable to abuse, as the members are elected by the people, with whom they retain a community of interests, and as they enjoy but a short term of office, and must soon return to the ranks of private life.

The patriots of the revolution who formed our national constitution, and the enlightened members of the convention which adopted our state constitution, thought otherwise, and accordingly limited the power of the legislature expressly in several important particulars, and by implication in many others. They, no doubt, thought, and rightly thought, that the possession of despotic power by any department of our government would be inconsistent with our free institutions, and that the safety of our lives, our liberty and our property, required that they should not be subjected to the arbitrary disposal or control of any man or set of men.

It may be that the ordinary use of intoxicating drinks necessarily leads to their frequent abuse, and that the interests of society require that property in them should be in effect annihilated. If so, they might, and possibly should, be drawn from the pale of constitutional protection. But that has not yet been done, nor can it be done by any other power than that by which our organic laws were ordained. Whatever those

The People *v.* Toynbee.

institutions require the court must award, as it is the duty of the judges, imposed upon them by their official position, and under the solemnity of an oath, to support the constitution of our common country, and of our own state from whatever quarter, or under whatever pretence, they may be assailed.

I have not the slightest wish to extend any protection or encouragement to the habit of inebriation, or to throw any impediment in the way of the good and the virtuous who are so solicitous to arrest its progress. It is an abomination, and should be suppressed (so far as human means can do it,) by precept, by example, and by legitimate legislation. But we should go no further lest we " do evil that good might come." The injunction against that is wise; as the evil is certain, while the production of the good might be, at least, problematical.

The judgment in the court below being erroneous, it must be reversed

ROCKWELL, J.—The defendant has been convicted before a court of Special Sessions held by the county judge of Dutchess county, of having sold intoxicating liquor in violation of the act for the prevention of intemperance, pauperism and crime, passed April 9, 1855. It is claimed that the defendant should be discharged from custody.

I. Because so much of the said act as prohibits the sale of intoxicating liquor is void. That such prohibition is an unauthorized invasion of private rights, and a violation of the fundamental law.

It is clear that under every free government there are certain fundamental and inherent rights belonging to individuals which are not solely dependent upon the will of the legislature; and it is unnecessary to examine the written constitution of the state to ascertain whether they are expressly shielded by that instrument from legislative encroachment. The rights of personal security, or personal liberty, and private property do not depend upon the constitution for their existence. They existed before the constitution was made or the government

was organized. These are what are termed the absolute rights of individuals, which belong to them independently of all government, and which all governments, that derive their powers from the consent of the governed, were instituted to protect. They are defined as follows: " By the absolute rights of individuals we mean those which are so in their primary and strictest sense, such as would belong to their persons merely in a state of nature, and which every man is entitled to enjoy, whether out of society or in it." (1 *Blackstone's Com.* 123.)

But while these rights are better protected, they are not as entirely absolute under government as in a state of nature. They are subservient to such measures as become necessary for the preservation of the government, its defence against external or internal enemies, or the promotion of the best interests of the whole community. For the protection of the government against external danger, individuals may be compelled to enter the military service, and to subject and expose themselves to the hardships and perils of war. For the protection of society against the consequences of crimes, offenders may be deprived of liberty, property or life. Lunatics who become dangerous to others may be imprisoned. Persons sick of contagious diseases may be removed to and placed in hospitals. Property may be removed or destroyed, or trades suppressed, which endanger the public safety or health. Property may be taken from individuals in the form of taxes, and applied toward the support of the government and its institutions. In short, government is not to be restrained in the exercise of its legitimate powers, which are essential to the public welfare, because the rights of individuals would be injuriously affected thereby.

In cases where private property is directly and specifically taken for the public use, compensation must be made to the owner. But cases are constantly occurring where individuals are subjected to great and ruinous losses of property through the operation of public measures and laws; but these losses being merely consequential and incidental to the exercise of the legitimate powers of the legislature, the individual injury is not the subject of legal redress. Individual loss frequently

The People *v.* Toynbee.

results from the grading of streets, the construction of canals, bridges, ferries, railroads and similar improvements; but if the law-making power in the exercise of its legitimate discretion decides that such improvements are conducive to the public good, no individuals whose injuries are consequential merely will be permitted to arrest the action of the government, or will even be entitled to compensation for the injury which he may sustain. *Radcliff's Executors* v. *The Mayor, &c., of Brooklyn.* (*4 Comstock's Reports,* 195.)

We may assume for the purposes of this case, at least, that the legislature of a free state is not competent to pass a tyrannical law; that is, one which restrains the natural rights of individuals for any other purpose than to advance some public good or to repress some public evil. The distinction between laws which are tyrannical because they unnecessarily infringe upon the absolute rights of individuals, and those which are consistent with civil liberty, although in restraint of natural liberty, is very clearly pointed out by Blackstone, as follows:

" Political or civil liberty, which is that of a member of society, is no other than natural liberty, so far restrained by human laws (and no further) as is necessary and expedient for the general advantage of the public. Hence we may collect that the law which restrains a man from doing mischief to his fellow-citizens, though it diminishes the natural, increases the civil liberty of mankind; but that every wanton and causeless restraint of the will of the subject, whether practiced by a monarch, a nobility, or a popular assembly, is a degree of tyranny; nay, that even laws themselves, if they regulate and constrain our conduct in matters of mere indifference, without any good end in view, are regulations destructive of liberty; whereas, if any public advantage can arise from observing such precepts the control of our private inclinations in one or two particular points will conduce to preserve our general freedom in others of more importance by supporting that state of society which alone can secure our independence." ( 1 *Black. Com.,* 125.)

There is no doubt that a great number of individuals will

sustain serious loss of property and derangement of business through the operation of the prohibitory feature of the law in question. But this consideration is not decisive of the question of legislative competency. The question still remains: Was the passage of the act an exercise of the legitimate discretion and power of the legislature founded upon considerations of public policy, tending to promote the morals, the health and safety of the community, or was it a mere wanton and unnecessary invasion of the private rights of individuals?

Any interference with the right of property is not the primary object of this law. Its object is to prevent intemperance, pauperism and crime. Surely these are proper subjects of legislation. A law aiming at the prevention of these evils by regulating, and to a certain extent prohibiting the sale of intoxicating liquor, has long existed as one of the police regulations of the state. The present law assumes that the former law has been found insufficient to accomplish the ends for which it was designed. That the regulation of the sale of intoxicating liquor having failed to suppress intemperance, pauperism and crime, and the public evils flowing therefrom, it has become necessary to try what virtue there is in prohibition.

Whether the law can be carried into effect, whether the whole result will not be a mere legislative enactment of prohibition without the power of enforcing it practically, whether the evils at which the law is pointed will not be aggravated instead of suppressed, are matters addressed solely to the discretion of the legislature, and with which the judicial branch of the government has no concern.

The objects of the law are matters in which the whole community are interested. Drunkards, paupers and criminals are burdens upon the public, enemies to the peace, welfare and happiness of society. Can it be doubted that if the traffic in intoxicating liquor was entirely suppressed their number would be greatly diminished?

It is enough to uphold this law that its tendency is to prevent the public evils against which it is directed, and to pro-

The People *v.* Toynbee.

mote the public benefits which it is designed to reach. It is not difficult, by ignoring the whole object and purpose of the law, to make out a very plausible case of legislative encroachment upon private rights. But this is not a just or fair mode of considering it. The great ends of public policy which it was intended to subserve are clearly within the scope of legislative competency. The public evils which it was intended to suppress are the most formidable to the peace and welfare of society which those who make or administer the laws are called upon to encounter. Assuming that the legislature have acted in good faith, that they have not wantonly and unnecessarily invaded private rights under the mere pretence of preventing public evils, I think the question whether the public benefits are of greater weight or importance than the individual losses which will result from the prohibition of the sale of intoxicating liquors as a beverage, is one of legislative discretion, and with which the judiciary has no concern. It was for the legislature to determine to what extent it was necessary to interfere with private rights in order to accomplish the great ends of public policy which they had in view; to array on the one side the serious loss of property and derangement of business which must ensue from the passage of this law, and on the other the appalling statistics of intemperance, pauperism and crime, and then determine whether the public necessity was sufficiently urgent to justify the individual wrong.

But is further claimed that the defendant should be discharged from custody.

2. Because it does not appear, from the complaint under which he was arrested and convicted, that he sold liquor which was not imported. That, by the true construction of the exception at the close of the first section of the act, the unrestricted sale of an imported liquor is permitted. The language of this exception is as follows: " This section shall not apply to liquor, the right to sell which in this state is given by any law or treaty of the United States." It is said, that as this clause occurs in a penal statute, and is part of the definition of the offence which it is the intention of the law to prohibit

and punish, it must be *strictly* construed. This may be so; but a *literal* construction of the clause will render it entirely nugatory. The rights of those whose interests are protected by the exception forbid such a construction. There is no law or treaty of the United States by which the right to sell any description of liquor is *given* directly or indirectly. The right to sell liquor or other property is not given by any law of the United States or the state of New York. It exists as a necessary incident to the right of property, independently of any positive law. It has been held by the courts of the United States that the right to sell liquor of a certain description and in a certain condition, is *secured* by the operation of certain laws of the United States against any restraint of the right of sale by state legislation. That is to say, when the act of congress authorizes the importation of liquor, the right of the importer to sell it results as a necessary incident to the right to import, and is secured to him against any interference on the part of the state legislature by the paramount authority of congress. The question then is, what description of liquor is it the right to sell which, notwithstanding any prohibition by the laws of this state, is derived from or secured by the act of congress? It is imported liquor, in the casks or packages in which it was imported. The exception from the prohibition is exactly coextensive with the right to sell secured by the act of congress; and the exception was plainly and solely intended to avoid a conflict between the state and federal laws. Any other construction would be so totally at variance with the whole spirit, scope and intention of the entire law as in my judgment to be utterly inadmissible.

The rules by which the sages of the law have ever been guided in seeking for the intention of the legislature, are maxims of sound interpretation, which have been accumulated by the experience, and ratified by the wisdom of ages. (*Plowden's Rep.*, 205.)

The resolutions of the barons of the exchequer in *Heyden's* case were the following: " For the sure and true interpretation of all statutes in general, be they penal or beneficial, re-

The People v. Toynbee.

strictive or enlarging of the common law, four things are to be discerned and considered:

" 1. What was the common law before the making of the act?

" 2. What was the mischief and defect against which the common law did not provide?

" 3. What remedy the parliament hath resolved and appointed to cure the disease of the commonwealth?

" 4. The true reason of the remedy. And it was held to be the duty of the judges at all times to make such construction as should suppress the mischief and advance the remedy, putting down all subtle inventions and evasions for continuance of the mischief, *et pro privato commodo*, and adding force and life to the cure and remedy according to the true intent of the makers of it *pro bono publico*." (3 *Reports*, 7.)

Surely we are not called upon to reverse these admirable rules for the construction and interpretation of statutes, and so to construe this act as will certainly and clearly advance the the mischief which it was intended to suppress, and suppress the remedy which it was intended to advance.

It is further claimed that the defendant is entitled to his discharge.

3. Because the proceedings against him were in violation of law and void. I can perceive no substantial error in these proceedings down to the time when the defendant was brought before the county judge upon the warrant issued by that magistrate for his arrest.

He then demanded that his examination should be taken, and offered bail for his appearance at the next court of Sessions of Dutchess county. This was refused, and he was therefore tried and convicted before a court of Special Sessions held by said county judge. In refusing an examination or to take bail for the appearance of the defendant, I think the county judge committed an error which was fatal to the validity of all the subsequent proceedings against the defendant. The examination of the defendant, should have been taken by the county judge; and if upon the examination of the whole mat-

ter it appeared either that no offence was committed, or that there was no probable cause for charging the defendant therewith, he should have been discharged. If there was probable cause to believe the defendant guilty, bail should have been taken if offered by the defendant for his appearance at the next court having cognizance of the offence. (2 *R. S.*, 708, 709, 710.)

A court of Special Sessions is one of limited jurisdiction, deriving all its power from the statute. It could only acquire jurisdiction over the person of the defendant upon his request to be tried before it, or his omission for twenty-four hours after being required to do so to give bail for his appearance according to law. (2 *R. S.*, 711, 712.)

I think the conviction of the defendant was void and does not authorize his detention in custody.

Proceedings in both cases reversed.